1               UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF MISSISSIPPI
2                   ABERDEEN DIVISION

3

UNITED STATES OF AMERICA         PLAINTIFF

4

VS.                      NO. 1:15CR98

5

JAELYN DELSHAUN YOUNG          DEFENDANT

6

7                   SENTENCING

8

        BEFORE HONORABLE SHARION AYCOCK
9      UNITED STATES CHIEF DISTRICT JUDGE

10

               Oxford, Mississippi
11            August 11, 2016

12

APPEARANCES:

13

14  For the Government:   JAMES CLAYTON JOYNER, Esquire
                    ROBERT H. NORMAN, Esquire
15                 U.S. Attorney's Office
                    900 Jefferson Avenue
16                 Oxford, MS  38655

17                 REBECCA MAGNONE, Esquire
                    U.S. Department of Justice
18                 National Security Division
                    950 Pennsylvania Avenue, NW
19                 Suite 1742
                    Washington, DC  20530
20

For the Defendant:   DENNIS C. SWEET, III, Esquire
21                 DENNIS C. SWEET, IV, Esquire
                    Sweet & Associates, PA
22                 P.O. Box 1178
                    Jackson, MS  39215-1178
23

Court Reporter:      PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
24                 Federal Official Court Reporter
                    301 West Commerce Street, #13
25                 Aberdeen, MS  39730

1    (CALL TO ORDER OF THE COURT, 11:00 A.M.)

2    **THE COURT**:  You may call the case, please.

3    **COURTROOM DEPUTY**:  Court calls Case Number 1:15CR98,

4    *United States of America versus Jaelyn Delshaun Young* for

5    sentencing.

6    **THE COURT**:  Thank you.  Representing the government in

7    this proceeding is Clay Joyner and Rebecca Magnone.  And she is

8    with the Department of Justice.  We welcome you.

9    Also seated at the government's table is Steve

10   Thomason, who was the FBI agent in this case, as well as Bob

11   Norman.

12   Also, at the defense table, I have Dennis Sweet, who

13   represents Ms. Young, and also -- is it Terris?

14   **MR. SWEET, III:**  No, it's Dennis Sweet.

15   **THE COURT**:  No, the young man --

16   **MR. SWEET, III:**  Dennis Sweet, IV.

17   **THE COURT**:  -- behind you -- beside you.

18   **MR. SWEET, III:**  My son.

19   **THE COURT**:  Yes.  What's your first name?

20   **MR. SWEET, III:**  Dennis

21   **THE COURT**:  No.  What's his first name?

22   **MR. SWEET, IV:**  Dennis Sweet, Your Honor.

23   **THE COURT**:  Oh, okay.

24   **MR. SWEET, III:**  Terris Harris --

25   **THE COURT**:  Is it junior?

1          **MR. SWEET, IV**:  IV, Your Honor.

2          **MR. SWEET, III**:  IV and III.

3          **THE COURT**:  Oh, my goodness.  Okay.  Thank you.  So

4    just as -- I assume Mr. Sweet, Sr., that you are going to be

5    handling the matter today?

6          **MR. SWEET, III**:  Your Honor, I will handle most of it.

7    We have a couple of witnesses that my son will come up, if the

8    Court allows it.  If not, we'll --

9          **THE COURT**:  Okay.  If he desires to make an

10   appearance, I will handle that as an oral motion at this time,

11   but he is not on the docket as an appearance in this case.

12         **MR. SWEET, III**:  May I make an oral motion that he be

13   allowed to participate, Your Honor?

14         **THE COURT**:  Any objections?

15         **MR. JOYNER**:  The government has no objection, Your

16   Honor.

17         **THE COURT**:  Very well.  Thank you.

18         **MR. SWEET, III**:  Your Honor, may I just say that

19   Mr. Harris left, and he's taken over a lot of responsibility

20   for doing things for me in this case.  That's why he's here.

21         **THE COURT**:  Okay.  Thank you.

22         Probation officer in this case is Kimberlee Hatter,

23   and she is in the courtroom.

24         Counselors, I'm advised that at least counsel for

25   Ms. Young desires to call some witnesses, and I thought it

1    might be appropriate to allow you to call those witnesses
2    before we get started here at the podium so you can remain
3    seated at counsel table rather than the questioning of the
4    witness.
5              Does the government intend to call witnesses?
6              **MR. JOYNER**:  No, Your Honor.
7              **THE COURT**:  Okay.  So, Mr. Sweet, if you desire, you
8    may call your first witness.
9              **MR. SWEET, III**:  Mr. Young.
10         (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)
11             **COURTROOM DEPUTY**:  Thank you.  Have a seat.
12             **MR. SWEET, III**:  May I proceed, Your Honor?
13             **THE COURT**:  Yes.  If you would, please, come to the
14   mike at the podium for the benefit of the court reporter.
15   **LEONCE YOUNG, DEFENDANT'S WITNESS, AFTER BEING DULY SWORN, WAS**
16                **EXAMINED AND TESTIFIED AS FOLLOWS:**
17                      **DIRECT EXAMINATION**
18   **BY MR. SWEET, III:**
19   **Q.**    State your name in a loud, clear voice for the court
20   reporter.
21   **A.**    Leonce Brian Young.
22   **Q.**    And where do you live?
23   **A.**    6303 Indiana Avenue, Vicksburg, Mississippi.
24   **Q.**    And how long have you lived in Vicksburg?
25   **A.**    I've been in Vicksburg about 19 years -- 19 or 20 years.

**Q.**   And you're married?

**A.**   Yes.

**Q.**   And your wife's name?

**A.**   Benita Barnes Young.

**Q.**   And children?

**A.**   Jaelyn Young -- Jaelyn Delshaun Young and Kaylin Marie Young.

**Q.**   Now, I want to ask you how you're employed now.

**A.**   I'm employed with the Vicksburg Police Department.

**Q.**   And how long have you been -- what is your rank with the police department?

**A.**   I am supervisor over the traffic division.

**Q.**   And how long have you been with the Vicksburg Police Department?

**A.**   About 19 or 20 years.

**Q.**   Do you have any military service?

**A.**   Yes.

**Q.**   And tell the Court about your military -- when did you enroll in the military?

**A.**   I enrolled in military in 19 -- I mean, 1980 -- 1991 -- 1990.  I'm sorry.  1990.

**Q.**   And what branch did you enroll?

**A.**   In the Navy.

**Q.**   And what rank did you have?

**A.**   I'm an E6 in the Navy.

1 **Q.** I just want you to tell the Court about your military
2 service for us, please.

3 **A.** Yes. I did several tours in the military. Around --
4 about 14, somewhere around there. Most of my tours was
5 overseas in the Middle East where I was in charge of -- I was a
6 vehicle commander. We ran the convoys. I was in several
7 combat areas. And that's pretty much -- did a lot of that
8 during my tours.

9 **Q.** I wanted to tell the Court some of the places you served
10 or you were deployed to.

11 **A.** Yes, I was -- Afghanistan, Iraq, Africa, Bahrain, the --
12 most of my time was in the Middle East. I really don't talk
13 about it much because of the things that we went through. I
14 lost a lot of friends there and stuff like that, but most of my
15 time was in the Middle East, yes -- yes, ma'am.

16 **Q.** And you were in combat?

17 **A.** Yes, sir. We -- the unit I was with, we were in and out
18 of combat doing convoys and everything.

19 **Q.** And you told me there were times when you -- were there
20 substantial times when you were away from your family?

21 **A.** Yes, there were several times. What's so hard about this
22 whole situation is, my oldest daughter, Jaelyn Delshaun Young,
23 many of my tours, Your Honor, she didn't want me going. She
24 didn't. She begged me not to go, but I had a moral obligation
25 to my country.

1    And I explained it to her, that it's not about me staying
2    home.  It's about me protecting the country that I love.  And I
3    would give my life to my country to make sure my family and my
4    friends and my community, my state, and my country is free from
5    anybody that tried to come and hurt our country.  I would give
6    you my life easily.  I wouldn't think twice about it.

7    And I told her that "You might not understand now, but in
8    time, you will, that you always want to be free no matter what.
9    Always be free.  Always tell the truth, and no matter what
10   happens, the truth will set you free."

11   And she couldn't understand.  She was like, "But why --
12   why can't somebody else do it?"  I said, "At this point in my
13   life, I can't -- I can't rely on somebody else to do something
14   that I need to do as a man for my family."

15   And, you know, it's hard telling a child that's going to
16   school and won't (sic) be at school the first day without her
17   daddy because he's overseas and she don't know if he's -- if
18   he's alive or not.  And I've done that to her several times.

19   And the last two times that I left was, I think, the
20   hardest, because I wasn't there for Jaelyn's graduation.  I
21   wasn't there for her Senior Day when she went to school.  I
22   wasn't there, Your Honor, when she first went to Mississippi
23   State because I was overseas fighting for our country.

24   And no matter how I told her on the phone when I did, was
25   able to talk to her -- because I didn't have the freedom to

1      just pick up a phone anytime. She didn't have the freedom to

2      just call me anytime she wanted to talk to me, because where we

3      were, we don't have that freedom. We make sure people in

4      America have that freedom.

5      That's why we give our life -- that's why my friends

6      that's not here today gave their life for everybody in America

7      to say whatever they want to say, do whatever they want to do,

8      because that's what we do. We give back. When other people

9      run away, we run to it.

10      And that's what I tried to explain to her. And she

11      couldn't understand it. She could not. And as hard as it was

12      I wanted to stay, I couldn't, because I have a moral obligation

13      to my country. And it doesn't matter who don't understand what

14      we do, we have to do it. We have a moral -- we have that

15      obligation. We swear to it. We're under oath to do that.

16      **Q.**     Let me ask you this. The fact that you were gone, do you

17      feel -- you told me this, and I want you to tell -- express it

18      to the Court -- that it affected your relationship with Jaelyn?

19      **A.**     Yes. I think, with me gone, it took a toll on my

20      daughter. It took a toll on my daughter. Because the times

21      that she wanted to talk to me, she couldn't. Because when she

22      watched TV and she see people dying, she don't know if it's her

23      father or not.

24      And I think that right there started bothering her, and I

25      think it started bothering her more and more, because when I

did call, I couldn't talk for -- you know, I couldn't have a -- what we call a Hollywood conversation. It was, "Hey, I'm okay. I'm doing fine. How are y'all doing? Are you doing okay in school? Daddy loves you. I got to go."

Because we would come in -- we was running a lot of convoys, a lot of stuff going on, and when we would come in -- we would go out for twenty-six days, come back for three days. And, basically, the first day you want to sleep, so you really don't want to talk to them. The next day you're trying to get your clothes and stuff together, but, oh, I've got to take out some time to call family, because that third day you're loading up everything that you got back in that vehicle and you're gone again, and you're pushing out, and you've got to go different places.

And, you know, it's hard. It's hard, you know. And even -- even with the letter writings -- even when they would write me letters, I was getting them two and three months after they sent them. By the time they would get a letter from me, it was two or three months prior sometimes, even if they even got them.

**Q.** I want to ask you this question, and this will be the last thing. You said you'd like to express something to the Court. Take the opportunity to express to the Court what you --

**A.** Your Honor, I know my daughter -- what she did was wrong,

1 but part of that is my fault.  And I just wanted to say that,

2 you know, I'm willing to do whatever it takes to keep our

3 country safe, I'm going to be honest with you, but at that

4 time, I think my daughter was -- she was lost.  And whatever

5 she do, she put her heart and soul into it.

6     But I beg of you to have some leniency on my daughter.

7 I -- as much as I've fought for my country, fight for my

8 community as a law enforcement officer -- and I understand

9 things is going on in the world today, but the things that they

10 say about my daughter is not the person that they're saying.

11 I've been with her all of her life.  I know her.

12     And, yes, I probably did let her down, but I let her down

13 because my country needed me.  Sometime I have to let them down

14 even in law enforcement because my city needs me, my community

15 needs me.  I'm a servant for my community and my country, and I

16 took that oath in law enforcement, and I took that oath with

17 the military, and that's what I do.

18 **Q.**    Thank you.

19     **MR. SWEET, III:**  I have no further questions, Your

20 Honor.

21     **MR. NORMAN:**  May I proceed, Your Honor?

22     **THE COURT:**  You may.

23                **CROSS-EXAMINATION**

24 **BY MR. NORMAN:**

25 **Q.**    Mr. Young, my name is Bob Norman.  We've spoken before,

1    haven't we?

2    **A.**   Yes, sir.

3    **Q.**   And I'm -- I'm sorry we have to be here for a number of

4    reasons.  I can honestly say that to you, but I want to talk

5    with you for a moment about what brings us here today.  I want

6    to review very briefly with you your daughter's history,

7    because she grew up in a good family, didn't she?

8    **A.**   Yes, sir.

9    **Q.**   Her mother is a teacher, I believe now a principal; is

10   that correct?

11   **A.**   No, sir.

12   **Q.**   Not correct?

13   **A.**   She's a superintendent.

14   **Q.**   A superintendent.  I'm sorry.  I didn't mean to demote

15   her.  But my point is, her mother has been in public education

16   all her life?

17   **A.**   Pretty much, yes, sir.

18   **Q.**   And you have been in public service, either in the United

19   States Navy or with the police department, all of your life?

20   **A.**   Yes, sir.

21   **Q.**   And Ms. Young was raised in that environment, and she did

22   well at Vicksburg.  She did well in high school.  She did well

23   in gymnastics.  She was popular.  She was successful.  And she

24   had a good life?

25   **A.**   Yes, sir.

1  **Q.**   And then something happened?

2  **A.**   Yes, sir.

3  **Q.**   Okay.  And you want to take some responsibility for that,

4  but, Mr. Young, I say to you this -- and I served ten years in

5  the Marine Corps.  I know where you're coming from.

6       But thousands and thousands of other servicemen have left

7  their families and gone overseas to do their duty without their

8  children betraying their country and wanting to go join ISIS to

9  kill Americans.  We have to face that fact, don't we?

10 **A.**   May I say something?

11 **Q.**   Yes, sir.

12 **A.**   You're in the military.  Do you have any kids?  Have you

13 ever just told your kids bye and just walked off and it didn't

14 bother you?

15 **Q.**   I'm sorry.  I don't hear very well, so --

16 **A.**   Have you ever told your kids bye and just walked off and

17 it didn't bother you?  They ask you why you're leaving.  Have

18 you ever been in a position where your kids want you not to go

19 but you can't -- you have to fulfill that obligation --

20 **Q.**   I understand that.

21 **A.**   -- that you're bound by --

22 **Q.**   I truly --

23 **A.**   -- the orders of the President of the United States.

24 **Q.**   I truly understand that, Mr. Young, and I -- believe me,

25 I have all of the respect in the world for that and for the

1  people that do that every day, but we also have to face the

2  fact that most of those people don't end up in a courtroom with

3  a child charged with betraying her country and wanting to join

4  an organization such as ISIS.  So something has happened here

5  that you're not responsible for is what I'm suggesting.

6  **A.**    Well, I would say that I'm here because of my daughter,

7  and I'm sure there are other servicemen that might not be in a

8  federal court with their kids, but it cause a problem.  It

9  does.

10 **Q.**    Absolutely.

11 **A.**    And today is my day with my child.

12 **Q.**    Absolutely.

13 **A.**    I can't speak on another service member, but I know there

14 are service members that have had to go through issues with

15 their kids, whether it's drugs --

16 **Q.**    That's right.

17 **A.**    -- runaways.  This is my -- this is my time, and this is

18 with my daughter.

19 **Q.**    And we're all --

20 **A.**    So I can't speak on anybody else's that's in the military

21 right now.

22 **Q.**    And I'm sorry.  I didn't mean to interrupt you.  We're

23 all trying to understand, Mr. Young.  You're trying to

24 understand.  The prosecutors are trying to understand.  The

25 Court wants to understand.

1      But you heard what your daughter said about the Marines

2  that were killed in Chattanooga.  She celebrated that.  She

3  thanked Allah for the fact that a warrior had killed American

4  Marines.  That makes it hard to understand.

5  **A.**   Well, the only thing I know is there was no video of it,

6  no audio of it.  Everything was only text message or Twitter.

7  Anybody's computer can be hacked.  Anybody can let somebody

8  else use -- I can use your computer, and you're on line, and I

9  can go say what I want.  Once I hit send, you sent it.  I

10  didn't.

11  **Q.**   So it's your belief that she really didn't say that?

12  **A.**   I can't say -- you know, she pled guilty, so I'm going to

13  go -- because I always told my children to tell the truth

14  regardless.

15  **Q.**   Okay.

16  **A.**   The only thing I do know is that it doesn't matter whose

17  computer it is, whoever's logged in, I can go under your name,

18  I can say what I need to say and hit send.

19  **Q.**   Mr. Young, there's something else that you and I both

20  learned --

21  **A.**   Yes.

22  **Q.**   -- during our military service.  We have to take

23  responsibility for our actions, don't we?

24  **A.**   Yes, sir.

25  **Q.**   Thank you, sir.

1    **THE COURT**:  Redirect?

2    **MR. SWEET, III**:  No redirect, Your Honor.

3    **THE COURT**:  You may step down, sir.

4    **THE WITNESS**:  Thank you so much, Your Honor.

5    **THE COURT**:  Who would you call next?

6    **MR. SWEET, IV**:  Ms. Benita Young, Your Honor.

7    (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

8    **COURTROOM DEPUTY**:  Thank you.  Have a seat.

9    **BENITA YOUNG, DEFENDANT'S WITNESS, AFTER BEING DULY SWORN, WAS**

10   **EXAMINED AND TESTIFIED AS FOLLOWS:**

11   <u>DIRECT EXAMINATION</u>

12   <u>BY MR. SWEET, IV:</u>

13   **Q.**   Ms. Young --

14   **A.**   Yes.  Hi.

15   **Q.**   -- please state your full name.

16   **A.**   Benita Barnes Young.

17   **Q.**   And, Ms. Young, where do you live?

18   **A.**   I live at 6303 Indiana Avenue, Vicksburg, Mississippi.

19   **Q.**   And where are you currently employed?

20   **A.**   With the Madison School District.

21   **Q.**   And what is your job?

22   **A.**   Superintendent.

23   **Q.**   And how long have you had that position?

24   **A.**   Since January 2016.

25   **Q.**   Okay.  Please tell us about Ms. -- your daughter,

1   Ms. Jaelyn Young, growing up.

2   **A.**    Yes.   Jaelyn Young -- well, my baby, Jaelyn, when --

3   first of all, I have to say -- I have to take you way back.

4         When I was pregnant with Jaelyn, she was actually -- I

5   was told that she would have Down's syndrome and that we would

6   have to abort Jaelyn.  We disagreed, and several months later,

7   Jaelyn was born without Down's syndrome.

8         As a child growing up, she was very vibrant, very

9   energetic, always wanting to make someone laugh, always

10  laughing, met friends anywhere she went.  Even in Wal-Mart when

11  she got lost one day, she found her way to the cashier, just

12  like I had instructed, and told her -- told the person standing

13  there "My name is Jaelyn Young, and my mother's lost."

14        And the reason for that, during that time, Jaelyn was --

15  during the time in the country, they were kidnapping children.

16  And I explained to Jaelyn what would happen if she's in a very

17  busy store.  And so I instructed her over and over, and one day

18  it actually did happen.  She got lost in the store, but she did

19  exactly what I asked her to do.

20        She's always been that way, doing exactly what I asked

21  her to do, because, of course, she didn't want to disappoint

22  me.  She's had high expectations for herself.  Ever since she

23  was about to go to middle school, she wanted to be an

24  obstetrician/gynecologist.

25        And she even told family one day -- they didn't

1  understand.  "What's an obstetrician/gynecologist?"  And she
2  said, "You don't know and you're a grown up?"  So that's the
3  type of person she was.  Everyone thought, well, she was very
4  wise beyond her years.

5       But as she was growing up -- in elementary school, she
6  was a gymnast, honor student.  In middle school, she was a
7  cheerleader.  Very popular in her school.  Took honor classes.
8  When she went to high school, she was kind of -- the crowd was
9  much larger.  She kind of got lost in the crowd, at least she
10 thought, but she was very popular in all of the things that she
11 did.

12      She was on the homecoming court.  She was in the "Total
13 Sound" group.  She served in various clubs and organizations.
14 She always wanted to give back to her community.  She even
15 served as a tutor for those students that had difficulty in
16 math.  She even was a homecoming escort for students with
17 disabilities.

18      A little fellow that she escorted that particular year,
19 she told me -- she came home.  She said, "Well, Mom," she said,
20 "I have a choice to attend the -- I think it was a Mu Alpha
21 Theta trip or to be the escort to the disabilities.  Which one
22 you think I ought to do?"  I said, "Jaelyn, you have to make
23 that decision."  And she came home.  She said, "Well, I think
24 I'll go with the homecoming escort."

25      So she escorted a little boy, walked up to her.  I think

he had disabilities with his legs, problems with his legs.  And she said -- she came home after the event, and she said, "Mom," she said, "he was so handsome and so nice."  She said, "I just don't understand.  Why does God make people that way?"  And she just burst into tears.  And I reminded her.  I said, "Jaelyn, you wanted to be a doctor one day.  If all of us were perfect, there would be no need for a doctor."

So she said, "He told me when I walked up 'You look like an angel,'" that she was -- and she was ecstatic by the fact.  She said she remembered that -- walking up to the young fellow, and he was running off because he wanted to run and play with the rest of the children, and as he ran, he fell.  And she went to help him up, and he said, "Stop."  She stopped in her place, and he wanted to get up by himself.

So when she asked me that question, why does God make people that way, and I said, "Just what he told you.  To stop.  He was independent.  He wanted to do things on his own.  That's what we all have to learn.  We do things on our own, but at the same time, we need each other."

Going through her senior year, she got off the cheerleading squad because there were some episodes of bullying.  And she was a victim of bullying, and she never reported it.  Never told us until after she went off to college.

But the two ladies that went with her -- the young ladies

that were with her during her junior year -- let me just back up for a minute -- they had gone off to college. They were older than she was. They were her very best friends. So her senior year, she thought she had no one, that she was by herself. Here she was in school at the high school where she thought that a lot of people disliked her.

Regardless of all of the activities she was involved with, regardless of all -- how popular she was, she just felt a loner, until she found one friend one day. And that one friend did not actually graduate with her because she succumbed and she died before their graduation. And Jaelyn was distraught by that. She actually thought she had absolutely no one.

She went to college. Prior to her graduation -- let me back up there. Her dad was supposed to be at her graduation. On the day of her graduation -- or the week before her graduation, her dad was called to service. And she said, "There you go again."

Let me remind you, as an elementary school student, third grade, her dad was called to war. Junior high school, her dad was called to war. A week before her graduation, her dad was called to war. She didn't understand that.

He was not there for her first day of taking her off to college, so Mom had to pick up those, and it was difficult. I can tell you personally as a mother with two young girls it was very difficult.

1       My husband was faithful.  He did what he had to do for

2   his country.  My daughters were young, and I had to be that

3   strength in front of them.  And they knew some days -- I had

4   some very tough days, because some days turn into weeks and

5   almost months sometimes when I did not hear his voice, and I

6   grew worried.  Jaelyn would worry.

7       So when he would call or Skype, we would run to the

8   computers, and she would see her dad, and she was excited until

9   the very next time.  We would watch the news and hear about all

10  of the things that had happened.  And she said, "Mom, was my

11  dad in that?"  She was worried as a kid in junior high school.

12      In junior high school -- I did not know until one day I

13  was taking her to practice.  This was around maybe seventh

14  grade -- I looked on her legs, and I saw some cuts on her legs,

15  and I asked her what happened.  And she told me, she said,

16  "Nothing."  I said, "Well, Jaelyn, those look like cuts, razor

17  cuts."  And she said, "Well, Mom," she said, "I cut myself."

18      But it was about five or six scars, and to me, it looked

19  intentional, and I scolded her for it, because I did not know,

20  and I did not understand.  But all of that time, she'd gone on

21  through high school, and I thought everything was fine.

22      She went off to college, and she had a difficult time.

23  She called one night, and she said, "Mom, I just don't think I

24  can do it.  I just don't think I can do it.  It's too much.

25  It's too much."  And I said, "What is too much?"  She said,

1  "Mom, it's just a lot.  It's just a lot."

2       And I'm thinking, like I felt when I went off to college

3  alone, Tough up, Jaelyn.  Suck it up.  You'll do fine.  Take

4  care of your business.  Do what you have to do, and you'll be

5  out of there in a few years.

6       My toughness, I drew that because of my husband's

7  absence, many nights alone in a city where many times break-ins

8  in homes, and all it was, just me and my two girls.  So I had

9  to grow some pretty thick skin to be that strong person because

10 Dad wasn't there.  So they saw that, although I covered it up

11 as best I could, and I thought I was doing a pretty good job.

12 Apparently, I wasn't.

13      But Jaelyn went off to college.  And that night when she

14 made that phone call and I told her to tough it up, I look back

15 now and should have noted that there was a problem -- that

16 there was a problem and she was crying out.

17 **Q**.    You understand now -- you're saying you should have

18 reached out and helped her?

19 **A**.    I should have.  When I look now at the cuts on her leg,

20 the night that she made that phone call, and then even going

21 through this here.

22      When the agents came to our house that Saturday morning,

23 two days after my child made 20 years old, and told us what

24 happened, I knew they were talking about the wrong person.  And

25 I told them, "I think you have the wrong house," because Jaelyn

had never been in trouble.  Never been in a fight.  Never had
been sent to the principal's office.  Teacher never had to send
a letter of reprimand.  She was a perfect child, if there is
such a word.  She had never had an issue.  We've never had a
problem with her nor her sister.

But Jaelyn was sheltered.  I can tell you that.  She was
not allowed to go to certain things and things that were going
on and the events that happened in Vicksburg.  She had a
curfew, and it was expected that she abide by that curfew.
Even when she turned -- prior to her turning 20 years old,
there was a curfew, and she had to abide by those.

She was brought up in a Christian household, Christian
beliefs, and attended church with family regularly, and it's
expected that she continue on.  But this was a shock -- a true
shock to our family, because we've always said, "This is an
extremely smart girl and -- but she has absolutely no common
sense."  We would laugh about that and joke about that.

But my biggest worry was not that Jaelyn would become a
statistic, that she would become pregnant prior to graduating
from high school, or that she wouldn't finish college.  My
biggest fear was she would go off to college and someone would
take advantage of her.

And I say that because, in her junior year, we allowed
her to drive to school and she -- instead of riding the bus
because the school was very near our house.  And with cars --

1  with children having cars, persons tend to take advantage of
2  you.

3      She came home.  I said, "Well, Jaelyn, why are you late?"
4  "Well, I had to drop this person off.  I had to drop this
5  person off."  And she was just kind of telling me.  I said,
6  "Well, Jaelyn, who are these kids?"  And she started explaining
7  who they were.  "Well, Mom, they're my friends."

8      And I said, "Jaelyn, they are your friends because you
9  have a car.  They were not your friends before."  I said, "You
10 understand that some people will use you to get what they want
11 from you?"  But she didn't believe that.  "Oh, Mom, they're
12 good people.  They're good."

13     But the very fear that I had for my child is the very
14 fear that struck us on that August 8th morning last year, that
15 someone or something had taken advantage of my sweet child,
16 who's very innocent, very green and naive, and she had allowed
17 herself to succumb to such a thing.  And she wrote in a letter
18 that I received back in March, and she said that "I feel so
19 stupid for the things that I've done."

20 **Q**.   All right.  Thank you.

21     **MR. SWEET, IV:**  No further questions.

22     **THE COURT**:  Cross-examination?

23     **MR. JOYNER**:  No questions, Your Honor.

24     **THE COURT**:  Thank you.  Ma'am, you may step back.
25 Other witnesses?

1   **MR. SWEET, III:**  We call Reverend Mike Fields.  This

2   will be our last witness.

3   (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

4   **COURTROOM DEPUTY**:  Thank you.  You may have a seat.

5   **MICHAEL WAYNE FIELDS, DEFENDANT'S WITNESS, AFTER BEING DULY**

6   **SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

7   <u>**DIRECT EXAMINATION**</u>

8   <u>**BY MR. SWEET, III:**</u>

9   **Q.**   State your name in a loud, clear voice for the Court,

10  please.

11  **A.**   My name is Michael Wayne Fields.

12  **Q.**   And are you a pastor?

13  **A.**   I am a pastor.

14  **Q.**   And what's the name of your church?

15  **A.**   Triumph Church in Vicksburg, Mississippi.

16  **Q.**   And are you married?

17  **A.**   Yes.

18  **Q.**   Children?

19  **A.**   Yes.

20  **Q.**   All right.  And you know my client, Jaelyn Young?

21  **A.**   Yes, I do.

22  **Q.**   And just briefly -- the Court -- the first time the Court

23  got to know her was these proceedings.  Would you explain to

24  her about how long you've known her and about her upbringing

25  briefly?

1  **A**.    The Young family came to our church and our fellowship --

2  I think it was about 2004, if I remember right.  It's been at

3  least 12 years or so.  And they came as a family, visited a few

4  times, and then joined our church and were very involved from

5  the very beginning.

6        And Benita started teaching Sunday school.  That was one

7  of her first volunteer positions.  She still -- 12 years later,

8  still does that as well.

9  **Q**.    That's Jaelyn's mom?

10  **A**.    Yes, Benita.

11  **Q**.    And about Jaelyn's involvement in the church, can you

12  tell the Court her involvement in the church?

13  **A**.    Yes.  Jaelyn, of course, was a little girl, about ten or

14  eleven years old, I guess, when they came.  And she was just

15  precious, well-mannered, quiet.  You know, our church is not a

16  huge church, but about 500 parishioners, so as a senior pastor,

17  I would get to see her in the hall.

18        Certainly had much more interaction with her parents, but

19  the girls, I always remember them at church with their parents

20  every time, you know, practically speaking, the doors were

21  open, because that's the -- that's the kind of members that the

22  Youngs were.  I mean, they're there every weekend, every

23  service, serving in the capacities that they serve in,

24  especially Benita, always involved in the children's ministry.

25        The girls were always with her, and, of course, they come

1   up through the children's ministry, going to Sunday school on

2   Sunday morning, and then we also had children's ministry in our

3   Wednesday night service.  Jaelyn and Kaylin were a part of that

4   as well.

5         And then, of course, when she progressively moved up

6   through the ages, became part of our student ministry when she

7   was in high school.  And then when she goes -- went to college,

8   I only got to see her when she would come home for holidays.

9         But you're asking -- my memories of her is that she's an

10  outstanding young lady and always there, involved, and never --

11  never given her parents a minute's problem.  Never -- always

12  well-behaved at church.  All children are well-behaved at

13  church, but the Young children always were well-behaved,

14  well-groomed, there, involved and, you know, just an

15  outstanding family and the whole family involved in the church.

16  **Q**.   Just briefly, I want you to tell the Court, when you

17  heard the news about this case, what was your reaction?

18  **A**.   Well, I -- just total shock and disbelief.  And surely

19  there's a mistake here.  Something's wrong.  Something's not

20  right, you know.  Just didn't want to believe it and was hoping

21  and praying in the beginning that this has got to be a mistake.

22              **MR. SWEET, III**:  That's all we have, Your Honor.

23              **THE COURT**:  Cross-examination?

24              **MR. JOYNER**:  No questions, Your Honor.

25              **THE COURT**:  Thank you, sir.  You may step back.

1          **THE WITNESS**:  Thank you.

2          **THE COURT**:  Any other witnesses?

3          **MR. SWEET, III**:  No, Your Honor.  In light of the -- I

4    know that we had a lot of people in the community that wanted

5    to send the Court communications in letters, and I think we

6    forwarded those to the Court, and we are not going to call all

7    those people but use these three and rely on the letters and

8    the workup we had by Dr. Summers.

9          **THE COURT**:  Thank you.  Would you bring Ms. Young to

10   the podium, please.

11        (PARTIES COMPLY.)

12        **THE COURT**:  Ms. Young, you're appearing before the

13   Court today for sentencing.  On a previous occasion, you

14   entered a plea to Count 1 of the indictment, which was

15   conspiracy to provide material support to a designated foreign

16   terrorist organization.  Do you recall entering that plea?

17        **THE DEFENDANT**:  Yes, ma'am.

18        **THE COURT**:  And today you're here to be sentenced.

19   Since you appeared last in court in Aberdeen, you -- your

20   counselor should have received a copy of the presentence

21   report.  Have you had an opportunity to review that report?

22        **THE DEFENDANT**:  Yes, ma'am.

23        **THE COURT**:  Are there any objections to the report?

24        **MR. SWEET, IV**:  Your Honor, we filed some objections,

25   but I believe that it was amended and incorporated our

1    responses in the new presentencing order.  And it just alleges

2    the arguments we made in the summary that Dr. Summers submitted

3    and incorporated that summary by reference, Your Honor.

4         **THE COURT:**  So to be clear, you filed, in Document

5    Number 64, Ms. Young's objections to the presentence

6    investigation, but do you state to me today that all of those

7    have been addressed, or do I need to address any other

8    objections?

9         **MR. SWEET, IV:**  They've all been addressed in the

10   amended order, Your Honor.

11        **THE COURT:**  Thank you.  Does the government have any

12   objections to the presentence report?

13        **MR. JOYNER**:  No objections, Your Honor.  If I could

14   point out, the objections that were filed by the defense really

15   took a -- it's almost a hybrid document, objections coupled

16   with almost a sentencing memorandum, and at some point, the

17   government would like to address a couple of the points they

18   raised in that document.

19        **THE COURT:**  You may do so at this time.

20        **MR. JOYNER**:  Certainly, Your Honor.  I'll deal with

21   the psychiatric report last.

22        There was a request within the body of that document

23   that the Court consider that there have been other cases with

24   lesser sentences than the cap that was agreed upon here by the

25   parties, specifically citing that of *Shannon Conley* and that of

*Abdullahi Yusuf.*

And if I could, Your Honor, may Mr. Sweet and I approach very briefly for a side-bar?

**THE COURT:** Yes.

(BENCH CONFERENCE OFF THE RECORD.)

**MR. JOYNER:** May I proceed, Your Honor?

**THE COURT:** You may.

**MR. JOYNER:** On that point as to Ms. Conley, that was in the District of Colorado, and I would point out that the difference in that case is that Ms. Conley supplied very substantial assistance to the United States Government. That was the sole justification for that sentence.

I point out one other difference in the cases involves she did obtain training and was certainly willing to travel overseas to engage in violence in Syria. She was lured there by an ISIS recruiter who was, you know, consistently radicalizing her, pulling her in that direction, became her fiancé, rather than what happened in this case, which is the person who initially plans to go brings another individual into the plan, which is what Ms. Young did.

I'd point out, likewise, that that case was charged prior to congress increasing the penalty for material support for a designated foreign terrorist organization. That occurred June 2nd of 2015 in essentially congress' recognition of the problem that we have, the threat that we face, and essentially

1     the American public's revulsion of their own citizens

2     committing treason by trying to join these groups.

3           He points out the *Yusuf* case. The *Yusuf* case is in

4     Minnesota. I would say to the Court that that case is an

5     anomaly. The Somali community in Minnesota is the largest

6     Somali community on the planet outside of Somalia itself. And

7     there is a pilot program unique to that community with partners

8     in that community that is attempting to address that problem of

9     attempted travel to Somalia principally to join the extremist

10    groups there that are trying to essentially have an Islamic

11    takeover of that country's government.

12          Now, those were the two cases counsel opposite pointed

13    out. I've found a couple other -- well, a few other recent

14    cases and the sentencings in those cases.

15          In June of 2015, Ali Shukri Amin -- he's a 17-year-old

16    from Virginia -- he was indicted for and pled guilty to and was

17    ultimately sentenced for conspiring to provide material

18    support, the exact same charge we're dealing with here. He was

19    17 years old. He provided some advice as to how to employ

20    Bitcoin to avoid detection, and he facilitated the travel of an

21    18-year-old to ISIL-controlled territory.

22          That puts this case pretty close to what we're dealing

23    with here, Your Honor, in that you have a young person -- and,

24    again, Ms. Young was not able to successfully facilitate her

25    travel and that of Muhammad Dakhlalla, but that was certainly

1  the attempt.  And that 17-year-old young man received a
2  sentence of 11 years.

3  Two sentences on June 28th, 2015, in two separate
4  districts.  Miguel Moran Diaz, he was -- he was charged with
5  illegal possession of a firearm, and what had targeted him
6  essentially by the government was that he was an open ISIL
7  supporter.  He received a sentence of 10 years.

8  Same date, Leon Nathan Davis, I believe out of
9  Georgia, received a sentence of 15 years.  That was, likewise,
10  the attempt to provide material support in the form of
11  personnel, the exact same charge we have here.  Essentially the
12  same fact pattern.  He attempted to travel overseas.  Was
13  arrested at the airport.  His sentence was 15 years to serve.

14  Mufid Elfgeeh, 32 years old.  He received a sentence
15  of 22 years for conspiracy to provide material support, and,
16  likewise, he was actually sending money overseas to terrorist
17  groups.

18  And then there's the case of Nicholas Michael
19  Teausant.  Again, very close to what we have here.  It was
20  June 7th of this year, a couple of months ago.  He's 22 years
21  of age.  He was charged with attempting to provide material
22  support to ISIL in the form of personnel, that personnel being
23  himself.  The sentence in that case was a sentence of 12 years.
24  He, likewise, was arrested in the attempt to travel.

25  On July 25th, 2016, less than a month ago, Adam

1  Dandach from California, 22 years old as well, received a
2  sentence of 15 years.  And what I'd point out about his case
3  is, not only was it essentially the same charge, he's
4  attempting to provide material support in the form of
5  personnel, himself, to this designated foreign territory
6  organization, but he -- likewise, his attorney cited a history
7  of mental health problems in mitigation.  The Court heard all
8  of that mitigation, and he received a sentence of 15 years with
9  a lifetime of supervised release supervision.

10       So then I would like to move on to the point that is
11  raised by counsel opposite.  There's a statement made in the
12  document that was filed that -- there's a paragraph dealing
13  with the subject but is that Jaelyn Young is much less culpable
14  than Muhammad Dakhlalla because he made two statements
15  regarding violence.  I'd point out a couple of things.

16       The government's position is that that statement is
17  fairly specious given what is contained in the discovery,
18  which, of course, the defense has.  Ms. Young's own letters
19  that she left behind when she thought she would be overseas in
20  Syria where no one would be able to do anything to her because
21  of what had been done, in those letters, which, of course, are
22  incorporated into the presentence investigation report, in the
23  letter addressed to Mom, Dad, and Kaylin, she says, "I love
24  you.  I'm sorry.  Do not alert the authorities.  I will contact
25  you soon.  I am safe.  Don't look for me because you won't be

able to retrieve me if you tried.  I'm leaving to become a medic.  I couldn't cut it here.  Don't blame the Dakhlallas for my disappearing.  They took me in, acted as my Starkville parents on your behalf, and I repaid them by allowing their son to come with me."  And then parenthetically, "He wanted to." "It was all my planning.  I found the contacts, made arrangements, planned the departure.  I am guilty of what you soon will find out.  And I avoided your calls and texts to make it easier to leave."  And she closes with, "I am not coming back.  I couldn't if I wanted to."

By her own statement, she is the planner, the driving force behind the attempt to travel to join an organization that at the time was openly murdering Americans that fell into its hands.

To the authorities also a letter that was left behind. "I have decided to leave home fully aware of the consequences of my actions, should I be caught."  I would point out, consequences that she's attempting, to a degree, to avoid here today.

Her own letters point out that it was her idea to travel to Syria in the first place.  It was she who engaged in planning the trip.  The online platform communications that took place that make up especially the bulk of the initial discovery in the case all point out that she was the one who initiated most of the contact.

1    If you look at the conversations and the contacts that

2  were had, the vast majority of those were by Jaelyn Young, not

3  Muhammad Dakhlalla.  And so she's the one that principally

4  communicated with the presumed ISIL recruiters, not Dakhlalla.

5  And that's from beginning to end.

6    At the beginning of this investigation, Jaelyn Young

7  is the one talking to the recruiter saying "I've got a Hijrah

8  partner that I'm bringing along."  And then at the end of the

9  communications just prior to August the 8th when the arrest

10  takes place, again, it's Jaelyn Young basically making

11  arrangements to meet at the Blue Mosque and its temple where

12  they're going to meet their contacts.  So start to finish,

13  that's true.

14    I'd point out that Ms. Young, when arrested,

15  prevaricated with the agents regarding what she and Dakhlalla's

16  ultimate goal was, which was to reach Syria and join ISIL.

17  And, in fact, Dakhlalla, from the moment of his arrest,

18  cooperated fully and completely and truthfully with the

19  authorities in contrast to Ms. Young.

20    Ms. Young showed radical Islamic videos to Dakhlalla

21  and not the other way around.  An example being homosexuals

22  being thrown from a rooftop in ISIL-controlled territory and

23  hate-filled speeches for Anjem Choudary, among others.  Not the

24  other way around.

25    It was Ms. Young that expressed at times hatred and

1    disgust of the United States in general, homosexuals in

2    particular, with the presumed ISIL recruiter, not Dakhlalla.

3    Dakhlalla did not endorse or praise Allah for the murder of

4    U.S. Military personnel in Chattanooga on July 16th of 2015.

5    That was Ms. Young.

6         And I heard the testimony of her father, and I get it.

7    I've got kids.  I love my children.  I don't want to believe --

8    certainly would not want to believe them capable of anything

9    like this.

10        But I'd point out to the Court that that statement

11   about the murder of the Marines is contained in the factual

12   basis that Ms. Young agreed to and admitted to at the time of

13   her plea.  And that was her that said that, not Muhammad

14   Dakhlalla.

15        Ms. Young wrote letters while in custody

16   encouraging -- again, those letters were not only incorporated

17   into the presentence investigation but were very much

18   incorporated into the psychiatric evaluation that was done.

19        She wrote letters in custody encouraging Dakhlalla to

20   provide false testimony in front of the jury regarding their

21   plan to go, in her words at that time, basically do an exposé

22   on the un-Islamic states, is what she called it, or a UNIS and

23   essentially instructing him what to testify to by making

24   statements such as, "Hey, remember what our plan was, don't

25   you?"  And then telling him what to say functionally.

1            And she also, at various times, forbade him from

2 entering a plea in the case. And I'd point out that she told

3 her own psychiatrist when he was visiting her that she was the

4 one that came up with the idea to travel, that she was the one

5 that planned the travel. That's in their report, that she was

6 by far the most fervent of all of the Muslims that she knew.

7 Likewise, that's drawn from the psychiatric report.

8            And I'd point out, so what's going on here is a little

9 bit of blame shifting. And I'm not sitting here trying to

10 absolve --

11            **MR. SWEET, III:** Your Honor, may we just approach one

12 moment, please? May we approach one moment?

13            **THE COURT:** You may.

14      (BENCH CONFERENCE.)

15            **MR. SWEET, III:** We have objections in our presentence

16 report. We have gone over the allocution at this point. When

17 that -- it's not responsive to --

18            **THE COURT:** The document that I want to concentrate

19 on -- what you respond to about that document.

20            **MR. JOYNER:** That's exactly what is in the document.

21            **MR. SWEET, III:** The only thing I say, all of the

22 cases, we don't have them to make distinctions or whatever.

23 Just take the word of the government that there is no

24 distinction between those cases and sentence. We ask the Court

25 to look at two -- did we produce all of those cases?

1     **MR. SWEET, IV:** No.

2     **MR. JOYNER**: It's available, open source media.

3     **MR. SWEET, III:** No. I just -- which ones you are

4 going to introduce, draw a distinction, the Court is

5 considering a sentence based on those other cases. I would

6 just like an opportunity to look at the ones -- and look at the

7 facts in them. Can't respond when I don't know.

8     **THE COURT:** I don't know that it's necessary to

9 respond.

10     **MR. SWEET, III:** Yes, Your Honor.

11     **THE COURT:** I mean, I guess this is the government --

12 in part, the government's argument as to the reasonableness of

13 the agreement when it cites these other cases in support of the

14 reasonableness.

15    I don't know what your position is going to be. It

16 may be that the agreement is reasonable. It may be that it's

17 not. I'm sure you will tell me why you think it's not

18 reasonable. But as long as this pertains to the content of the

19 document, you may proceed. But I'll give you an opportunity to

20 respond.

21     **MR. SWEET, III:** Thank you, Your Honor.

22   (END OF BENCH CONFERENCE.)

23     **THE COURT:** You may continue.

24     **MR. JOYNER**: On that statement of hers that she was

25 the most fervent of all of the Muslims that she knew, again,

1    citing from their psychiatric report, I would point out to the

2    Court as far as, I suppose, the argument that's to be made --

3    and I was pointing out when the request to approach was made --

4    no one's sitting here trying to absolve Muhammad Dakhlalla of

5    responsibility for this crime.  Muhammad Dakhlalla needs to go

6    to prison for what he did.  No ifs, no ands, no buts.

7         But to address the statement in their pleading that

8    Muhammad Dakhlalla is more culpable than Ms. Young, I'd like to

9    continue by pointing out -- regarding the argument of who it

10   was that was the more fervent Muslim and who was pulling who

11   along.  Page 527 of the discovery is one of the letters that

12   was written by Ms. Young to Muhammad Dakhlalla while they were

13   in custody.  And I'll just read brief portions of that.

14        It's addressed to My Habibi.  "Please don't be upset

15   while reading this."  And Habibi is an Islamic term of

16   endearment -- or an Arabic, rather, term of endearment.

17   "Please don't be upset while reading this.  I do fear for you,

18   My Love.  I know you feel that we have committed a tremendous

19   crime, but do you think that because non-Muslims captured us

20   and humiliated us and we have become, to our parents, painfully

21   dependent?  My Love, take a deep breath and think calmly and

22   clearly.  Are you doing and saying this to please non-Muslims

23   who are offended that we would dare consider leaving to fight

24   against them?"

25        And I would reiterate that "we would dare consider

leaving to fight against them." Muhammad Dakhlalla is not the only person that's mentioned violence or the possibility of it in this case.

"Indeed, we stole from my mother, and we lied to our parents, and I ask Allah to forgive us for that day and night. Habibi, when you read the Quran, are you really reading the Quran? Indeed, you say things now that are painfully shocking. My Love, why would you sit among and listen to people who are grossly transgressing against the signs of Allah?"

On page 528 of the discovery provided to the defense, the letter goes on: "I think about what would have to happen. I would come before a group of nonbelievers and plea to them, kissing their feet, promising to never have a desire to fight against them ever again. Yet, when I am here alone, I recall to memory al-Hadith and rulings (Sharia). I read all summer before our incident. Habibi, I looked and looked for anything that would negate ISIS or AQ," a reference to Al-Qaeda, "as a legitimate group and found nothing. My Love, I pray to Allah to guide me so that I carefully make my decision about them. I often find myself going back and forth in my mind about them. Before you say ISIS does not represent Islam, I challenge you to read Sharia or Hadith/Sunnah."

Then it goes on for several more pages with a reference to the previous letters instructing him to say things that weren't true, a side note in the margin: "And I apologize

1    for encouraging you to say things like UNIS in the beginning

2    because I feared persecution, but I've left things to Allah to

3    take care of," and then it trails off in the margin.  May be

4    blocked out by the copy.

5           My point in reading that snippet, Your Honor --

6    there's hundreds of pages of letters.  It's relatively clear

7    from the discovery that Muhammad Dakhlalla is not more culpable

8    than Ms. Young.

9           And, again, in one of the later letters to

10   Mr. Dakhlalla, she takes responsibility again in that letter

11   that she seems to be trying to avoid to a degree today.  She

12   said, and I quote, "I know you felt I ruined your life

13   completely.  I did.  I ruined yours, mine, our families'.  I

14   single-handedly screwed up everything that could possibly go

15   wrong."  Again, taking responsibility for being the driving

16   force behind the planned travel.

17          And, finally, as far as in regards to psychiatric

18   report, Your Honor, very -- I don't mean to belabor the point,

19   because I know the Court has read it, but the government does

20   not view that as a valid forensic exam.  The report makes no

21   note of objective testing.

22          From the contents of the report, I don't think there

23   was any interview of third parties.  There's no corroboration

24   of a report from teachers, school records, et cetera.  There's

25   no mention of the possibility of malingering.  And that's

particularly troubling, for the report itself notes on Page 25 that Ms. Young has a lifelong pattern of manipulation and lying.

Malingering testing and third-party cooperation are -- corroboration, rather -- excuse me -- are the standard for forensic psychiatric exams, and that standard was not met here.

The opinions provided in it are blatantly subjective, which is problematic given that there are objective measures that could have been employed, such as testing, to provide the Court with a non-biased measurable analysis.  And those things do not seem to have been employed here.

And the analysis seems totally dependent on the statements of Jaelyn Young, which is also problematic given that in her letters, comprising I think -- a series of letters -- or it's drawn from a series of letters from pages 535 to 550 in discovery -- she informs the defendant that, and I quote, "We will do and say whatever we need to to get out of this together."

And I would reserve any -- I just wanted to address those three points that were raised in the document filed by the defense, Your Honor.  And I would just like to reserve any response to the allocution.

THE COURT:  Thank you.

Mr. Joyner, I think what led to that discussion was my inquiry of the government if there were any objections to the

1　presentence report.

2　　　　**MR. JOYNER**:  And we had none, Your Honor.

3　　　　**THE COURT**:  But, now, these matters have been

4　addressed that you take objection to in what is styled

5　"Objections to Presentence Investigation" but, admittedly, what

6　contains the psychiatric report as well as an extensive

7　sentencing memorandum --

8　　　　**MR. SWEET, III**:  Yes, Your Honor.

9　　　　**THE COURT**:  -- in favor of Ms. Young.  So let me go

10　back to you, Ms. Young, and tell you that at this time what I

11　would do is give you an opportunity to speak.  If there's

12　anything that you would like to say, you may do so.  And then

13　I'll give Mr. Joyner an opportunity on behalf of the government

14　to address the Court.  And then, Mr. Sweet, I'll give you the

15　last word on your client's behalf.

16　　　　Ms. Young.

17　　　　**THE DEFENDANT**:  First, I wrote a letter, and then I

18　would like to add some things.

19　　　　**THE COURT**:  Okay.  Let's stop, because I can't hear

20　you.  Let's take the mike and sit it closer to you, and it may

21　be that we have to put it on some books or something.

22　　　　**MR. JOYNER**:  Your Honor, I could just slide this over,

23　if that helps.

24　　　　**THE COURT**:  Okay.  Ms. Young, would you stand at the

25　podium for me, please, or near the mike where you can speak

1 directly into the mike and I can hear you better.

2         **THE DEFENDANT:** Yes, ma'am.

3         **THE COURT:** Thank you. That's much better.

4         **THE DEFENDANT:** Your Honor, growing up, I never was a

5 problem child for my family or my community. In high school,

6 I was an honor student who excelled in STEM and had goals of

7 going to medical school to study neurosurgery. In college,

8 I took only advanced level classes and was an active

9 undergraduate researcher in the field of Nanogold and nano

10 subparticle study.

11         Looking back, I had then expected to be registering

12 for the MCAT and preparing the path to become a part of a team

13 of research doctors solving the complexities of

14 neurodegenerative diseases. However, overburdening myself with

15 long hours in the classroom as well as registering for lab, it

16 began to take its toll. Things started to fall by the wayside.

17 Anxiety and depression began to set in, and I often

18 contemplated suicide.

19         I, instead of turning to my family, turned to a man

20 who introduced me to Islam. Looking back now, I realize that I

21 was slowly secluded from friends I had known almost my whole

22 life. Visits home became scarce, and I went nowhere without

23 being accompanied.

24         I remember at one point even having to take down

25 posters of my favorite shows and music artists, some of which I

had listened to for as long as I can remember, all because they were deemed among the many things that were forbidden Islam.

Then I did not see everything for what it really was. In less than a year, I was about to leave behind a life that was all I had really ever known for one that I still -- for one that I did not and still do not fully understand. And I am glad that I was not successful.

Your Honor, I'm not certain what to ask you for. Much of this is still very surreal for me. All I know is that, after my arrest, the man I turned to vanished for his own sake, and much of the burden was put on my shoulders.

I thank God that my friends and family were there to help me bear that burden. And, again, I thank God, because it was during those moments things snapped back into focus and I returned to the person I've always been. Had it not been for being blessed with the family and community that I have, I would not have been able to handle this with such strength and patience.

Even in jail, I was treated very well by both inmates and guards and had little to no trouble. I believe God will allow the support on the outside of jail on account it's on the inside of jail to help me because I was being incredibly hard and unforgiving toward myself.

From the beginning, my family believed that there is a testimony in all of this, but now I'm starting to see what they

mean.  During my time in jail, I have been contacted by
60 Minutes, Diane Sawyer, and CNN Director Scott Bronstein.
And I now see that I, if given a chance, could turn this
mistake around into a lesson that could help.

Individuals like these previously mentioned are
willing to provide me with the platform necessary to project
the message world-wide to those who are doing it to the effects
this could have on their lives and the lives of their family.
A year ago, if I had someone paint the word cruality (phonetic)
for me, I would not have made the decision that led me here,
and I hope to be that figure for those who are considering the
same path.

Your Honor, that's my goal.  And, again, I don't know
what to ask for.  I only hope I can be reunited with my family
soon and work towards this goal.  Thank you.

**THE COURT:**  Anything else you would like to say?

**THE DEFENDANT:**  Yes, ma'am.  I'd like to say a year
ago -- sometimes you do things without really thinking, and
even going through this, I did things without thinking, but
when things really began to snap back into place, there was a
lot of guilt.

You know, just kind of the humiliation I put on my
family really started to take a toll on me, and that's when I
really started to cut myself -- relapse into cutting myself
again just because for nine or ten months -- I can't even

1  remember -- I was so outside of my character.  I really --
2  looking back, I wasn't myself.  I said and did things that were
3  so contrary to me.

4  And I don't -- it's -- it's just really heavy when you
5  have to snap back into who you really are and look at what you
6  were that wasn't you and it -- I don't know.  I just -- it's a
7  lot.  I was -- excuse me.  Sorry.

8  I remember just being ashamed.  I didn't even want my
9  little sister to come visit me in jail.  I didn't want to
10  accept money from my family.  I didn't -- sometimes I would
11  stop calling my family because I just couldn't handle it, you
12  know.

13  My dad tried to blame himself, and that's really hard.
14  I know I did wrong and -- sorry.  Like I said, I know what I
15  did was wrong, and like I said earlier, it just feels really
16  surreal.

17  It's -- one thing, like my mom had mentioned, when I
18  called and stuff, things were just getting too much.  They were
19  getting too much, and I did contemplate suicide then.  And she
20  thought she was being tough, and at that point, I just kind
21  of -- I went into myself.  And that's when I reached out to
22  him, and things really started to go down just spiraling.

23  I swear, if I could just go back, I'd take it back.  I
24  would have just rather dropped out of college or something and
25  start over, but it's just -- and I just want to tell my family

1  I'm sorry, despite everybody in this room.  The only people I
2  really want to apologize to especially is my family.

3          And I'm sorry my dad had to feel like he had to
4  apologize for me, and I'm sorry my mom had -- felt --

5          **MR. SWEET, III:**  Okay.  Your Honor, I want to address
6  a couple of things.

7          **THE COURT:**  Ms. Young, I'm not sure you finished, and
8  I'm not sure you're able to finish, but do you want to take a
9  moment?

10         **THE DEFENDANT:**  (Nods head up and down.)  Can you hear
11 me?

12         **THE COURT:**  You're going to need to speak up.

13         **THE DEFENDANT:**  Like I said, all this especially -- my
14 parents can tell you that in the beginning it was really hard
15 to get me to snap back out of it because it was a lot of --
16 dealing with a lot of humility and stuff.  But once I actually
17 opened up to my parents, there was still a lot to deal with,
18 because I hadn't seen -- at that time -- I've been in jail for
19 a year, and I've only started recently seeing my sister back in
20 February.  I just couldn't -- I can't handle it.

21         If I had somebody to tell me that I would be going
22 through all of this, I wouldn't have made that decision.  And I
23 know people are thinking that this past year -- these past two
24 years -- I can't even count -- is -- defines who I am, but
25 that's not who I am.  And it's just been really hard.

1    Like I said, just the guilt of my father being in the

2    military and being in this position.  It's, like, a slap to his

3    face and a lot of humiliation, and he's there for my sake, and

4    he could have turned his back on me.

5    And the fact that my parents -- with the news always

6    following them, there's just so much humiliation they're going

7    through, and I didn't think of that.  And if I did, I wouldn't

8    have done it.  And, yet, I'm so used to not ever causing my

9    parents a problem that, when this all happened, I just couldn't

10    deal with it, and I'm really sorry.

11    And it's not even just my dad.  I have multiple family

12    members in the military, and it's just like, What was I

13    thinking?  Like, this past year or two years has been a

14    complete blur.

15    Even now I recognize one of the guards who decided to

16    come and support me in all of this and help me.  He's sitting

17    back there, and it just kind of shows the kindness that I've

18    been given that really I didn't deserve.  I didn't.

19    Many of the inmates are really kind to me, and they

20    didn't have to be.  Many of the guards, many of them were

21    Marines, and they were in the military, and they were really

22    good to me, and they didn't have to be.  And that just added,

23    you know, more to it.  That added even more to feeling so -- I

24    just -- there's a lot I didn't deserve.

25    My family is here to visit me almost once -- two or

1　　three times a month bringing me books.  They always wanted to

2　　call me, and they didn't have to.  I received cards and letters

3　　from my family and my friends.  There was just so much love and

4　　support that I really didn't deserve, and that's what hurts

5　　more than anything.  Thank you.

6　　　　　**THE COURT:**  Thank you.  Mr. Joyner, anything from the

7　　government?

8　　　　　**MR. JOYNER**:  Very briefly, Your Honor.

9　　　　　Having addressed those three issues that were raised

10　　in the pleading by counsel opposite, I would just say this.

11　　Virtually -- well, the vast majority of the problems that are

12　　set forth in the psychiatric report that seems to form the bulk

13　　of the requested mitigation by the defense in this case are

14　　problems that every college student in America faces to some

15　　degree.  Depression, the issues regarding adolescent brain

16　　development, sometimes the absence of a parent, a strict

17　　mother.  Those are things that a great many students have to

18　　deal with in some way, shape, or form.

19　　　　　And I would say this.  In -- what's contained in that

20　　report, we don't dispute all of it at all by any means, and

21　　those things that are contained in that report, I'd point out

22　　that, in this case, where the guideline range actually exceeds

23　　the 20-year statutory maximum, the government already took

24　　every one of those criteria into account when the government

25　　crafted this plea agreement with the 11(c)(1)(C) provision that

1 essentially capped any sentence in the case at 12 years.

2 I guess what I would say is -- and I understand that
3 sentencing is completely at the purview of the Court, and I'm
4 certainly not attempting to infringe on that in any way, shape,
5 or form, but I would just point out to the Court that, in
6 crafting the agreement, we were aware of the issues with
7 Ms. Young, and every bit of that went into it as far as trying
8 to determine in negotiations with Mr. Sweet what would be an
9 appropriate and fair sentence in this case.

10 And I understand that he's welcome to -- it's a
11 12-year ceiling.  He can argue for anything he wants to, but I
12 would just point out that those items that they're leaning on
13 so heavily here today have already been taken into account by
14 the government when that 11(c)(1)(C) agreement was proffered to
15 the Court, Your Honor.

16 And I would point out further and in closing that the
17 government respectfully submits that a sentence of 12 years is
18 appropriate in this case when -- and I truly appreciate what
19 sounds like the sincerity of her apology and remorse, but that
20 apology and that remorse does not change the fact that she
21 betrayed both her family and her country in the most profound
22 way possible.  And a sentence of 12 years is appropriate in
23 this case, Your Honor.  Thank you.

24 **THE COURT:**  Thank you.  Mr. Sweet.

25 **MR. SWEET, III:**  Your Honor, I would just like to

1   first say that I got involved in this case at the request of

2   Jaelyn's family.  I had known her father, and he came to me and

3   asked for help, and that's how I got involved.

4        Along that line, I told him what we need to know --

5   and that psychiatric report is not some ploy to send the Court

6   and hire somebody who just wrote about mitigation.  Her father

7   and her mother, you can imagine, Your Honor, struggled how they

8   got there about their daughter.

9        I recommended that we do hire a psychiatrist.  One, to

10  see whether she was competent, but, number two, you can

11  imagine, they want answers.  Their daughter is in jail.  They

12  don't know what happened, and they hired someone.  I didn't pay

13  him.  And we attached the report.

14       I want the Court to understand that these folks are

15  just working folks.  They dug in their pocket to hire somebody,

16  and I didn't pay him.  They paid him.

17       I sent this report -- I've been asked for that report

18  by the government.  I sent it ahead of time, and they've had

19  it ahead of time.  They even asked, in light of the report,

20  could they send her for evaluation.  We agreed.  There was no

21  request.

22       I haven't heard about any testing or anything like

23  that, because I could have brought the doctor -- I had a

24  physician, a doctor, who did this report.  When I read it,

25  he -- I had used him before in cases.  This is the first time I

saw him write a 30-page report.

And to say it's something -- when I read it, I said, "You wrote a book?" He wanted to go back and see her some more. He felt it was important. And I said, "Give us your report. The government asked for it."

When they got it -- I didn't have to -- we didn't have to send -- I mean, we could have tried to just send it at the end. Any questions they had about it, anything they wanted to do psychiatric to her they could have done.

MR. JOYNER: Your Honor, I apologize profusely for interrupting --

MR. SWEET, III: That's not relevant.

MR. JOYNER: -- counsel opposite's argument. I would point out for the record, however, we've been requesting the report since February. And I understand it's not Mr. Sweet's job to type the report for his psychiatrist, but as far as how early or late it came in, the report came in roughly a week ago, I believe, or ten days, certainly no more than two weeks, leading us to discussions regarding whether or not we had to ask for a continuance on this sentencing to meet -- to have testing done to meet the report. That was why we've had the conversations we've had and, ultimately, I think an e-mail communication.

But I would just point out that that report did not come in all that early, but, likewise, after we read the

1    contents of the report, we were perfectly comfortable meeting

2    it with simply argument.

3        **MR. SWEET, III:** Right. And there's no request of any

4    testing or did he do malingering testing. There was -- the

5    psychiatrist took so much time in this case that he wanted --

6    he sent it. He reviewed it. He sent us a proof and asked for

7    it back. He took this very seriously.

8        And you can tell from the report that he took his time

9    and took it seriously that the Young family were hiring him,

10    and he wanted to try and give something that would be useful

11    for them, the Court, and for everyone to understand how this

12    young lady got here. That report doesn't make any excuses. It

13    doesn't even try to make excuses. It tries to tell the Court

14    what she was thinking, what her problems were.

15        She clearly had some issues. Anytime you have a

16    person who cuts themselves. That was early on, and that was at

17    the time that it happened. So that's not anything other than

18    to try to give this Court and her parents some insight into how

19    she got there.

20        On the issue of -- in the presentence report, we went

21    through a long litany about her conduct and what she said and

22    how we're trying to make Dakhlalla -- we simply said in that

23    report -- what we tried to say, nowhere here did she,

24    herself -- we keep hearing the report about the other things.

25    She made comments to the FBI agent praising this thing, but

1　nowhere in there does it say at anytime that she went and got

2　any weapons, that she sought to recruit weapons, that she was

3　going to carry weapons, that she was ever intending violence.

4　　　　In fact, they say, "What skills do you have?"  And the

5　FBI agent said -- she said, "Well, I'm a science major in

6　chemistry."  He said, "Well, you could be a medic."  She didn't

7　show up trying to get guns.  She had some gauze and some tape.

8　　　　On the issue of her -- and, Your Honor, I'm not trying

9　to -- the only distinction we've made is, this young lady

10　did -- never said she wanted to do violence to anyone other

11　than, like, some of the other cases or other people.  She never

12　sought anybody, contacted anybody, or directed anybody about

13　getting weapons or anything internally in the United States,

14　doing anything to anyone.  That's all we were pointing out

15　there.  As opposed to Dakhlalla, who said, "I'm going to fight

16　and be a fighter."  That's the only distinction we were making.

17　　　　As far as recruitment into it, she was not born a

18　Muslim.  She was not (sic) born here.  It was through her

19　contact in meeting him that she started going down this path.

20　That's not a blame issue.  That's a fact issue.  And the

21　psychiatrist tried to tell this Court how she got there and why

22　she went down that path, what was going on in her mind that

23　attracted her down that path.

24　　　　I think it's interesting to know that so we can see

25　how a child who has a father in the military, a mother who's a

1   superintendent, was an A student could go down this path.  I
2   think that report shows us.  It looks at the statistics of kids
3   and other things that you may use to say, hey, learn from this
4   and have a lookout for kids in this situation.  Rather than
5   just attack her, try and understand it.

6        And I think that report lays it out, Your Honor, in
7   detail.  I thought the psychiatrist thought it was important
8   enough for the parents and for this Court to understand how
9   this happened, where the red flags were that this young lady
10  was in trouble.

11       And she was in trouble, Your Honor.  She was in
12  trouble hurting herself physically.  She was in trouble with
13  her grades dropping, isolation, and other things that they
14  detailed.  And that's all the report was trying to demonstrate.

15       We looked at the other sentences, Your Honor.  And we
16  can go on with the young man this and the young man that.  This
17  young lady never talked to ISIS, never talked to anybody.  The
18  entire time she was talking to an FBI agent.  So as far as her
19  and her statements, they were made to him.  She never said she
20  was going to do violence.  She never tried to go and recruit
21  others.  Her only connection who came through this is through
22  Muhammad that we saw.

23       And so, Your Honor, to the extent -- and I want to say
24  that to the extent that we look at the other cases that he's
25  speaking about -- I'm not saying that her conduct is not

1    criminal or that she did not do anything.  Just when you look
2    at her conduct -- and the most condemning thing they say
3    about -- as far as -- in the area of violence is that when that
4    thing happened -- incident happened in Tennessee, she made some
5    comment, which were not good comments.

6         Your Honor, he mentioned all the other cases and -- at
7    times and whatever.  We did mention the *Conley* case, and we
8    mentioned it because her sentence is four years.

9         You mentioned about the Somalians, and they say that
10   that's an anomaly.  Well, this is an anomaly too, because you
11   have a young lady whose dad, for 21 years and 14 tours, put his
12   life on the line for the country, and it's an anomaly that we
13   have a child of a military person who felt that committed here.
14   Have we seen any cases in that situation?

15        The only thing I'm saying is, Your Honor, as far as
16   care and consideration, she's injured.  Some of it -- I'm not
17   saying he's responsible.  He -- of course, the father wants to
18   take blame.  He's not responsible.

19        But, Your Honor, for the fact that we don't have
20   someone who actually committed violence, whoever said they
21   would commit violence, who has the background she has -- we all
22   understand she has to be punished -- I ask the Court to
23   consider those things in giving her the sentence.

24        Court's indulgence.
25        (CONFERRING OFF THE RECORD.)

1      **THE COURT:** Let me address just a few things that have

2 been mentioned. I have read the doctor's report. Okay. So

3 while it's -- I think you refer to it as interesting. It is

4 interesting, because I see that Dr. Summers -- Dr. Summers

5 attempted to help explain to the family, as much as anybody,

6 why some of her background may have influenced her to do the

7 things that she eventually did.

8      **MR. SWEET, III:** Yes, Your Honor.

9      **THE COURT:** To some extent, I guess I consider the

10 report mitigating in that at least, number one, it's styled as

11 a mitigation report, but, two, though he doesn't talk about

12 them being 3553 factors, he's really talking about 3553 factors

13 to the Court.

14      **MR. SWEET, III:** He is, Your Honor.

15      **THE COURT:** So that's been taken into consideration.

16      Now, with respect to other sentences around the

17 country, the defense has pointed out two instances, and the

18 Court -- I have to be very sure about this. The Court doesn't

19 have any knowledge of the underlying facts in any of these

20 cases cited by Mr. Sweet or Mr. Joyner other than what you've

21 told me today in the courtroom. So I've not -- I have not

22 undertaken an independent research to go find every case in

23 America where a defendant has been charged with a similar

24 charge to try to ascertain some average of what appears to

25 have -- to be a customary sentence.

1    So I think what I have here with respect to your

2    argument about these cases is, on the one hand, Mr. Sweet,

3    there's a couple of cases out there, the Colorado and Minnesota

4    cases, that would be sentences less than 12 years.

5    And you point out to me that in the Colorado case -- I

6    believe Mr. Joyner points out to me in the Colorado case that

7    it -- certainly substantial assistance, the government's 5K

8    motion, played a part in that determination.

9    **MR. SWEET, III:**  That's correct.

10    **THE COURT:**  And then maybe the Minnesota case was kind

11    of unique because of the population from which the defendant

12    came.

13    Now, flip side, Mr. Joyner points out to me that there

14    are some six, seven cases -- noted that these are recent cases,

15    2015 and 2016 cases, and those range anywhere from 11 years to,

16    I believe, 15 years.

17    So my job is to know everything that I can know about

18    Ms. Young from the presentence report, take into consideration

19    the unusualness of this charge and the fact that this is not

20    something we deal with every day, so it would be natural for us

21    to look at other cases across the nation to see what reasonable

22    sentences would be for a similar charge, and then take into

23    consideration essentially the 3553 factors that's presented in

24    the mitigation report from Dr. Summers.

25    And my job then, taking all of that into

1    consideration, would be to really determine, do I, number one,

2    hold -- do I accept the stipulation under 11(c)(1)(C) that the

3    maximum sentence in this case should be 12 years?  That's

4    number one, because the statutory max is 20 years.

5            **MR. SWEET, III:**  Yes.

6            **THE COURT:**  And her guideline sentence was, goodness,

7    something like 262 months up to 365 months, so substantially

8    greater than the statutory max even under -- even the most the

9    Court can look at.  I'm capped out at 240 months because that's

10   the statutory max.  So there's a lot of ways to look at what

11   the sentence ought to be here, you know.

12           Ms. Young is 20 years old.  She's very young.  But I

13   guess Mr. Joyner said, you know, she's committed almost the

14   most egregious offense that she could commit against her

15   country.  So how do you balance that?

16           So I accept the 11(c)(1)(C) as the maximum should be

17   12 years for the reasons I've alluded to, and because, frankly,

18   Counselors, you've spent the time looking at these cases,

19   looking at underlying facts in these other cases, conferring

20   with the Department of Justice, conferring with Mr. Sweet,

21   understanding background and the uniqueness of this case, and I

22   think you're reasonable in saying that 12 is the max.

23           Now, the question really is:  It's up to 12.  So

24   should it be something less than 12?  And that's where I guess

25   we say the rubber really hits the road here, is should it be a

1   term less than 12 considering the background of Ms. Young, the

2   age of Ms. Young?  All of the facts and circumstances of the

3   case, history of this defendant -- and she has no criminal

4   history -- all of these things, should it be less than that?

5   Okay.  So, Ms. Young, this is not something I take

6   lightly.  There's a lot of information for me to consider here.

7   I wish I knew why you did what you did, and that might help the

8   Court derive at a reasonable, fair sentence for you, but I have

9   to acknowledge that, you know, this is as serious a crime as

10  one can commit.

11  And maybe the facts of your case differ a little

12  more -- they're a little more egregious or a little less

13  egregious than some of the other cases, but I don't think

14  there's any question.  From the memorandums that I've seen and

15  from the factual basis to which you pled, you -- I'll stop

16  short of saying initiated, but you were a willing participant

17  in a very, very serious crime.  And you've taken responsibility

18  for that, and I appreciate that you have, and I do think you're

19  remorseful.

20  I don't think it is your father's fault.  And though I

21  appreciate your father stating on the witness stand that he

22  wants to assume this responsibility, he's doing nothing

23  different than what other fathers would do in a similar

24  situation.  It's not his fault.  It's not his fault.  It's

25  yours.  You did it, and you're to blame, and you have to be

1  responsibile and stand on your own two feet about it.

2       So in light of the fact that I am going to accept the
3  12-year sentence as max, are there any further comments based
4  upon what I've stated?

5       **MR. SWEET, III:**  Your Honor, we appreciate you
6  accepting a 12-year sentence as the maximum.  We'd ask the
7  Court to consider -- she's going to prison for her actions, and
8  I would say the Court has traditional things to consider,
9  deterring her in the future.  I think that's done.  I think
10 there's things in place for the Court as far as deterring her
11 in the future.  She's remorseful.

12      I think the report from the doctor, not having
13 contact, I don't think we have to worry about her going down
14 this path again.  And then there are things in place with her
15 father and mother monitoring, so that could be done.

16      The other thing the Court has to do -- and I
17 understand, and I told her parents this.  This is a serious
18 problem in our country, and the sentences handed out by the
19 Court make statements, and the Court has to do that.  And the
20 sentences stand for just more than punishment.  They stand for
21 deterrence of her and others.

22      But, Your Honor, in considering all of those factors,
23 I think that the fact that this young lady is what she is, has
24 spent the time she has, she and her family have gone through --
25 I think the statement to others that if you get in this fact --

if you get in this situation, it's going to be prison for you and horrible for your family members. Think about that. I think that statement is being made.

Your Honor, I don't think, to make it further, it has to be 12 years. Don't let me say it that way, because I can't tell the Court what -- it matters what this Court thinks, not what I think. I would submit -- respectfully submit to this Court that the Court can make that statement without having to give her -- without having to sentence her to 12 years. But this Court makes those determinations.

I appreciate the opportunity to address the Court in that manner, and I would ask the Court to consider those in sentencing, that -- I think all indications that she's not -- and I know we'll bring up the -- when she was in the jail she wrote the letters to Dakhlalla, and that continued. And, you know, Your Honor, I was quite surprised when they gave me the letters. You can imagine. I'm going to see her, and her father is seeing her, and that occurred.

**THE COURT:** Uh-huh.

**MR. SWEET, III:** I think, though, it did -- there was an awakening. When I came and said, "Okay. You see these?" And she broke down. You know, I said, "Do you understand?" She said, "I understand." I said, "You have your family." I said, "We've been telling you that since I represent you. Why are you doing this?" She could only break down.

1  I don't think there's been an issue since.  I think at
2  some point it clicked with her.  You've got your family.
3  You've got your dad, your mom, and your close friends, and
4  that's where you need to be concentrating.

5  **THE COURT:**  Mr. Sweet, that's evidenced by the fact
6  that there are so many people in the courtroom on her behalf
7  here today.  And I think there's 22 -- 24 letters that I
8  received from various family members -- good gracious, family
9  members, public officials, lawyers in the Vicksburg area,
10  lawyers -- persons that Mr. Young works for.  I mean, this
11  family, from all indications, in the Vicksburg area is loved,
12  appreciated, very much the fabric of the community.

13  **MR. SWEET, III:**  I --

14  **THE COURT:**  I get that from these letters.

15  **MR. SWEET, III:**  You know, and I want to say -- I
16  don't want to get personal.  That's why I'm here --

17  **THE COURT:**  Right.

18  **MR. SWEET, III:**  -- because of Mr. Young, who he's
19  been in that community and having that man appear at my door
20  and say, "Please help me."

21  And I've done, as the Court knows -- you've seen our
22  efforts.  I wasn't trying to let him down.  But as far as that
23  community, what they -- Your Honor, I brought three people.
24  The people are all here, and there are people who called.  We
25  could have lined it up for people who support this young lady

1  and that family.

2  And I ask the Court, in that community, to have that
3  type reputation, and for her too, there's a lot of good and a
4  lot of hard work that went into that.  We've got a period of a
5  year where she made a serious, serious mistake.  I think those
6  statements have been made, and I'd ask the Court just to
7  consider that.

8  And whatever the Court -- let me say, we understand
9  when the Court said it would accept the max that this Court has
10  shown an understanding for accepting that.  We understand the
11  guidelines and all of that, so from that statement -- so I
12  almost feel uncomfortable asking the Court to go further, but
13  we would, because we think here you can serve justice without
14  having to give her 12 years.

15  **THE COURT:**  Thank you, sir.

16  Mr. Joyner, do you wish to say anything more prior to
17  sentencing?

18  **MR. JOYNER**:  Very briefly, Your Honor.

19  **THE COURT:**  Mr. Joyner, you've never done anything
20  very briefly.

21  **MR. SWEET, III:**  I'm finding out.

22  **MR. JOYNER**:  As long as we just -- as long as we don't
23  get me for perjury on that, Your Honor.

24  There's a -- there's a disconnect here.  Yes, she was
25  absolutely raised by a loving family.  Both of her parents are

1    very impressive people.  I truly appreciate her father's

2    service to our country.  But that's kind of a problem for me in

3    this case to a degree, because she was raised in absolutely a

4    loving environment.

5         You're talking about a kid who was an honor student.

6    At one point, I think she was number two in the state in

7    gymnastics, according to the psychiatric report, in her age

8    group.  She was raised in a completely supportive environment,

9    and yet, at the end of the day, she chose to betray every

10   closely held ideal of her family, and she chose to betray her

11   country.

12        And Mr. Sweet had a point.  The sentences in this case

13   address a number of factors, and the sentences in these cases,

14   I would hope, are designed to deter this type of behavior by

15   anyone else who wants to -- and you can characterize it however

16   you want to.  She just wants to be a medic.  You know, no one

17   here has accused her -- she's not accused in the factual basis

18   of wanting to take up arms against the United States, but what

19   she was accused of was wanting to provide personnel in the form

20   of herself to go over there, act as a medic, and patch up those

21   who are out murdering other people in the most brutal ways

22   imaginable.  That's what she signed up for.

23        And we don't have any question -- the Court doesn't

24   have to have any question about her intentions.  She was pulled

25   off an airplane -- I mean, the flight line, rather, trying to

board an airplane.

Every psychological factor that Mr. Sweet has discussed was taken into account when the 11(c)(1)(C) agreement was fashioned. You know, the government tried to negotiate what would be a fair sentence for this offense, and quite frankly, I'm completely comfortable, because I am familiar with the sentences across the country generally in the last several years, and I suppose that's why I cited a number of cases.

We could have cited more that were along the same lines, but the *Conley* case out of Colorado and the *Yusuf* case out of Minnesota, those are outliers, and I suppose that's why I wasn't crazy about the fact that just those two cases -- of them being in front of the Court as far as the sentence is involved, because the sentences across the board otherwise have generally been much, much greater than the sentences involved in those two cases, which do have some unique circumstances.

You know, here in this case, we have someone who essentially self radicalized, radicalized a travel partner, and attempted to go with him to join an organization that, again, at that time they were trying to join, is murdering not only Americans but basically every Christian, Jew, European -- you name it -- that they can get their hands on. That's what she was doing with eyes open. It wasn't like we didn't know what this group was all about. Watching videos of them throwing homosexuals off of rooftops.

1    So I just want to -- I understand that, you know,

2    she's not necessarily saying I'm going to carry a rifle, but

3    she had open eyes about who she was joining and what they were

4    all about.  And the government would simply ask, Your Honor,

5    that the sentence reflect that fact, and it's the government's

6    belief that the appropriate sentence that does reflect that

7    fact is one of 12 years.

8    Thank you, Your Honor.

9    **THE COURT:**  Thank you.  The Court adopts the

10   presentence report without change.

11   No count of conviction carries a mandatory minimum

12   sentence.

13   Under the guidelines, the total offense level is 35,

14   and the criminal history category is VI.  Now, the guideline

15   range in this case actually is 292 up to 365 months.  However,

16   the statutory max would be at 240 months, so it caps out at

17   240 months.  Supervised release range is not more than life,

18   and the fine range is 20,000 to 200,000.

19   Under the statute, I've already mentioned that it's

20   240 months' cap.  That also includes a $250,000 fine, up to

21   life on supervised release, and a $100 special assessment.

22   The Court is going to impose a sentence outside the

23   sentencing guideline system.  I'm going to impose a variance.

24   It's going to be below the statutory max.

25   The Court is going to accept the binding plea

1   agreement for the 11(c)(1)(C) that has been discussed and

2   stipulated to by counsel for the government and counsel for the

3   defendant that 12 years be the maximum in this case, and I

4   accept that.  I'm accepting that -- I'm accepting that 12-year

5   maximum sentence in this case due to the history and

6   characteristics of the defendant under 3553(a)(1).

7        Age.  This young lady is 20 years old.  Mental and

8   emotional condition is a factor.  I think that is proved out,

9   number one, by the fact that she committed the offense, but,

10  number two, all of those findings that are reported by

11  Dr. Summers.

12       This 12-month -- 12-year max also reflects the

13  seriousness of the offense, and it will promote respect for the

14  law and to provide just punishment.  Hopefully will afford

15  adequate deterrence to others that may -- that may commit this

16  type of offense.

17       So the Court is taking those into consideration, and

18  based upon all that I've read and considered in hearing the

19  arguments here today, as I've indicated, the Court accepts the

20  11(c)(1)(C) max of 12 years as the max applicable in this case.

21       Restitution does not apply.

22       In imposing sentence, the Court has considered the

23  advisory guideline range, the statutory penalties, and the

24  sentencing factors enumerated in 18 U.S.C., Section 3553(a).

25  The Court finds that imposing a sentence outside the advisory

1   guideline range would better achieve the statutory purposes of
2   sentencing.

3       Pursuant to the Sentencing Reform Act of 1984, it is
4   the judgment of this court, Ms. Young, that you be committed to
5   the custody of the Bureau of Prisons to be imprisoned for
6   144 months -- that's the 12 years -- on Count 1 of the
7   indictment.  Upon release from prison, the Court is going to
8   place you on supervised release for 15 years on Count 1.

9       Now, there are two mandatory conditions that you must
10  comply with.  You shall not possess a firearm, destructive
11  device, or any dangerous weapon, and you shall cooperate in the
12  collection of DNA as directed by your probation officer.

13      Once you are released, your probation officer will
14  explain to you a number of standard conditions.  Those
15  conditions I'm not going over today, but it's as if I were
16  enumerating those for you today.  You're bound by those
17  conditions.

18      In addition, there are some special conditions during
19  supervision.  You shall participate in a program for testing
20  and treatment for substance abuse.  You will remain in that
21  program until you're released by your probation officer.  Very
22  importantly, you'll participate in a program of mental health
23  treatment, and you'll remain in that program until you're
24  released by your probation officer.

25      Now, this is a somewhat unique condition, and so I

1   want to read this to you and have an understanding that it

2   applies specifically in your case, and I think you will

3   understand that.  Your attorneys have been noticed of this

4   condition that speaks to unannounced examinations of your

5   computer, but in light of the fact that that was your mode of

6   communication, it's appropriate in the Court's opinion.

7         You may be required to submit to periodic unannounced

8   examinations of the computer system on your computer or

9   computer-related devices, which may include retrieval and

10   copying of all memory, hardware, software, and/or removal of

11   such system for the purpose of conducting a more thorough

12   investigation of your computers.

13         The defendant may be required to have installed on the

14   computer any hardware/software that would monitor the

15   defendant's computer use or prevent access to particular

16   materials.

17         You shall provide the probation officer with accurate

18   information about your entire computer system, your computer

19   devices.  You'll be asked to provide all passwords used by you,

20   by the defendant, and your Internet service provider.  You will

21   abide by all of the rules of the computer restrictions and

22   monitoring programs.

23         Do you understand that special condition?

24         **THE DEFENDANT:**  Yes, ma'am.

25         **THE COURT:**  No fine is being ordered in this case.  If

1    you have not already paid the $100, that is due on the special

2    assessment.  It is due to the clerk's office.

3          Now, Ms. Young, by the Court accepting the 11(c)(1)(C)

4    in that plea agreement, you waived your right to appeal.  Do

5    you recall that?

6          **THE DEFENDANT:**  Yes, ma'am.

7          **THE COURT:**  So you have expressly waived any and all

8    rights to appeal the conviction or the sentence imposed in this

9    case and the manner in which the sentence was imposed on any

10   grounds whatsoever, including but not limited to grounds set

11   forth in 18 U.S.C., Section 3742.  That does not include

12   grounds for prosecutorial misconduct or for ineffective

13   assistance of counsel.

14         You've also waived your right to collaterally attack

15   the judgment or collaterally attack the sentence, and you waive

16   those except for those two exceptions that I've already noted.

17         Do you understand that?

18         **THE DEFENDANT:**  Yes, ma'am.

19         **THE COURT:**  So do you understand the judgment as I

20   have rendered judgment?

21         **THE DEFENDANT:**  Yes, ma'am.

22         **THE COURT:**  Mr. Joyner, are there counts to be

23   dismissed?

24         **MR. JOYNER**:  There are indeed, Your Honor.  The

25   government would move at this time *ore tenus* that Count 2 of

1    the indictment regarding Ms. Young be dismissed at this time.

2    **THE COURT:**  Thank you.  Count 2 is dismissed.

3    Mr. Sweet, are there any other matters on behalf of

4    your client?

5    **MR. SWEET, III:**  No, Your Honor.

6    **THE COURT:**  So, Ms. Young, I'm going to remand you to

7    the custody of the United States Marshal Service where you will

8    remain until you're transported to a facility.  Okay?

9    **THE DEFENDANT:**  Okay.

10   **THE COURT:**  Thank you and good luck to you.

11   (CONCLUDED AT 12:50 P.M.)

# CERTIFICATE

I, Phyllis K. McLarty, RMR, FCRR, CCR #1235, Official Court Reporter for the United States District Court, Northern District of Mississippi, was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I, Phyllis K. McLarty, RMR, FCRR, CCR #1235, have caused said stenographic notes to be transcribed via computer, and that the foregoing 72 pages are a true and accurate transcription to the best of my ability.

Witness my hand, this 1st day of November, 2016.


/s/ Phyllis K. McLarty
PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
Official Court Reporter